**EPPS v. WEATHERS.**
No. 189.

District Court, S. D. Georgia,
Augusta Division.
Jan. 11, 1943.

Robert A. Persky, of Augusta, Ga., for plaintiff.

W. Inman Curry, of Augusta, Ga., for defendant.

LOVETT, District Judge.

Asserting that they were not paid the minimum wages and over-time compensation required by sections 6 and 7 of the Fair Labor Standards Act of 1938,[1] the plaintiff Epps for himself and as designated agent for three co-employees brings this suit under section 16(b) against their employer to recover the unpaid wages and compensation, the liquidated damages and attorneys' fees and costs, authorized by that section.

The defendant, owning and operating a fleet of trucks and admittedly engaged in interstate commerce, answers that he paid full wages under section 6 for time actually worked, and as to over-time compensation he sets up in his answer that the employees suing, because they are employees with respect to whom the Interstate Commerce Commission has power to establish maximum hours of service pursuant to the provisions of the Motor Carriers Act of 1935, now part II of the Interstate Commerce Act as amended in 1940,[2] may not invoke section 7, as it is by section 13(b) [3] expressly made inapplicable to them.

The case was tried to the court without a jury. My findings and conclusions follow.

### Facts.

The plaintiffs are "drivers" of trucks, or "drivers' helpers" or "loaders", who crate, pack, assemble and load or unload the commodities transported by the trucks. They

---

[1] 52 Stat. 1060 et seq., 29 U.S.C.A. §§ 206, 207.

[2] 54 Stat. 919, 49 U.S.C.A. §§ 301, 304.

[3] 52 Stat. 1067, 29 U.S.C.A. § 213(b).

kept no records of the hours worked in any work-week. They depend entirely on their recollections, and their testimony as to the hours they worked during various weeks over a period of nearly four years is vague, indefinite and unsatisfactory. While for the periods in controversy there was a general understanding between employer and employees as to the hours they should report and complete their work each day, the understanding seems to have been more honored in the breach than in the observance. Apparently the employer did not understand that he was required to keep accurate records of such hours and therefore in that respect did not comply with the regulations of the Administrator; he merely computed the total hours they had worked each week and made his payments accordingly, at not less than the minimum hourly rates prescribed by the Act. He did not pay over-time compensation at a rate not less than one and one half times the regular hourly rate. He kept a permanent record only of the payments, which is in evidence, and has testified positively the payments were computed and made in accordance with the hours worked and the wage provisions of the Act for the several years of the service. The plaintiffs accept the statement of defendant as to the weekly payments made but not as to the hours they worked. They testify they worked upon an average 60 hours per week. I think the evidence of the defendant, based on his pay roll records, is more credible than that of the plaintiffs, and the facts I find accordingly. That these plaintiffs did not work each day in a week and worked irregular hours during each week is made manifest by the pay roll records, which plaintiffs adopt as correctly representing the compensation paid, for their weekly compensation varied from the low figures of $3 to $5 to as high figures as $23 to $24. They were also made advances of smaller amounts from time to time. Because the volume of defendant's business varied from day to day plaintiffs usually left their work when the day's work was done. Under circumstances like these, without some record to refresh one's memory, it seems quite impossible any employee could remember with any degree of accuracy how many hours he worked in any week extending over a period of four years in the past.

### Discussion.

1. Plaintiffs come within the over-time compensation provisions of section 7 of the Fair Labor Standards Act unless they were of the class of employees expressly exempted by section 13(b), which reads: "The provisions of Section 7 [section 207 of this title] shall not apply with respect to (1) any employee with respect to whom the Interstate Commerce Commission has power to establish qualifications and maximum hours of service pursuant to the provisions of section 304 of Title 49".

Title 49, Secs. 304(a) (1) and (2) provide: "It shall be the duty of the Commission—To regulate common carriers [and contract carriers] by motor vehicle as provided in this chapter, and to that end the Commission may establish reasonable requirements with respect to * * * qualifications and maximum hours of service of employees, and safety of operation and equipment."

Though literally the language of the Motor Carriers Act as amended just quoted is broad enough to include all employees of common and contract carriers (and similar language as to private carriers is equally broad), the word "employees" has been interpreted to mean "those employees whose activities affect the safety of operation" of the vehicles used in transportation. United States v. American Trucking Ass'n, 310 U. S. 534, at page 553, 60 S.Ct. 1059, 84 L.Ed. 1345.

It is contended here that as to "drivers" until October 15, 1940, and as to "loaders, drivers' helpers" until March 4, 1941, the Commission had not declared them within the class of employees affecting safety of operation.[4] The first questions therefore are (1) do the activities of the employees here affect safety of operation and (2) if so, are they exempt before and because of the failure of the Commission to exercise the granted power.

The Commission has always regarded drivers as subject to their jurisdiction, and no one can deny they are responsible for the safe operation of the vehicles they control. See Maximum Hours of Service of Motor Carrier Employees, 11 M.C.C. 203 and Motor Carrier Safety Regulations—Private Carriers, 23 M.C.C. 1. Loaders and Driv-

---

[4] Ex parte MC–3, MC–2, 3 M.C.C. 665, 3 M.C.C. 557. See, however, orders of Jan. 27, Feb. 8, May 27, 1939, MC–2, MC–4, and Motor Carriers Safety Regulations (Rev.) of Interstate Commerce Commission, including orders issued through November 4, 1940.

ers' helpers on March 4, 1941, were found by the Commission to perform duties which affect the safety of operation of motor vehicles. In the matter of Maximum Hours of Service of Motor Carrier Employees, Ex parte MC–2, 28 M.C.C. 125. The reasoning of the Commission as to loaders applies equally to one who crates and packs the goods for shipment. It seems clear that all of the plaintiffs are within the class over whom the Commission has jurisdiction to prescribe qualifications and hours of service, and therefore are exempt from the overtime provisions of Section 7 of the Fair Labor Standards Act unless delay or failure of the Commission to exercise its power keeps them under it.

■ It will be observed the exemption is based upon the *"power to establish"* by the Commission and not by its exercise. It is the existence of the power—not the exercise of it—which gives the exemption, if we give the words of the statute their ordinary meaning.[5] The reason for this is that at all times the Commission is open for employees to have their qualifications and hours established, and if they neglect or refuse to enter the forum having jurisdiction, the courts should not penalize their employers for their own faults. Where the question has been adjudicated, the great majority of the courts have held the existence of the power and not its exercise is the thing on which the exemption is made to depend, though the Circuit Court of Appeals for the Eighth Circuit in a decision now sought to be reviewed on certiorari reached a different conclusion[6].

2. We come next to consider the claim that minimum wages have not been paid.

■■ The burden is on the plaintiffs to establish by a preponderance of the evidence the number of hours worked and the amount of wages due; and the evidence to sustain this burden must be definite and certain.[7]. As already indicated in this the plaintiffs have failed. Not only is their evidence as to the hours they worked unconvincing, but I think it would be impossible for them to remember how long or how often they worked in the absence of some record made contemporaneously. The defendant seems to be a careful and intelligent business man. IIis integrity has not been assailed. He does have some records, i. e., pay rolls showing weekly payments to all of his employees, though it does not comply with the regulations of the Administrator as to the hours they reported for work and the times when they left each day. For this omission, though not to be excused, he should not be required to pay these employees wages that their evidence does not satisfy me he owes. The defendant has testified positively when these pay roll records were made up he computed the hours each employee had worked and multiplied the hours by the minimum wage provisions then applicable, and the product was the amount paid to each of them. I can not disregard this testimony. The payments support his testimony, if it is recognized that the hours were irregular, and the employees did not work each day.

■ It is urged upon me that the defendant admitted that the plaintiffs worked upon an average of 45 to 50 hours each week, and by accepting that average and applying the applicable minimum wage during the several years in controversy, the payments shown to have been made constitute underpayments. I did not understand defendant to so testify. But even if he had, the Circuit Court of Appeals for this Circuit has rejected the "average hours" basis for computing wages. See Jax Beer Co. case cited in note 7, particularly at page 175 of 124 F.2d. The court there said, notwithstanding each employee testified that "on an average" he worked from seven o'clock in the morning to nine o'clock at night: "To uphold the * * * judgment [for employees] we must base decision upon the guess, speculation, and averages made up from the uncertain recollections of these appellees. This we refuse to do". I do likewise.

[5] For contrary view, see Interpretative Bulletin No. 9 (April 11, 1941) U. S. Department of Labor, Wages and Hour Division, Office of Administrator.

[6] West v. Smoky Mountain Stages, D. C., 40 F.Supp. 296, 298–99; Bechtel v. Stillwater Milling Co., D.C., 33 F.Supp. 1010, 1013–14; Magann v. Long's B. T. Corp., D.C., 39 F.Supp. 742; Robbins v. Zabarsky, D.C., 44 F.Supp. 867, 868(8), 870; Wolfe v. Union T. & S. Co. (D.C.Ky.) unreported, decided Feb. 27, 1942; Bayley v. Southland Gasoline Co., 131 F.2d 412, certiorari granted, 63 S.Ct. 526, 87 L.Ed. ——.

[7] Super-Cold Southwest Co. v. McBride, 5 Cir., 124 F.2d 90, 92; Jax Beer Co. v. Redfern, 5 Cir., 124 F.2d 172, 175; Johnson v. Dierks Lbr. & Coal Co., 8 Cir., 130 F.2d 115, 116(7), 118.

6

Conclusions.

1. Plaintiffs are within the classification made exempt by section 13(b) from the provisions of section 7 of the Fair Labor Standards Act of 1938, and are not entitled to recover over-time compensation.

2. They are not entitled to recover any amount under section 6 of the Act for failure to pay the minimum wages prescribed.

Let the judgment be for defendant.